## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

**v.**　　　　　　　　　　　　　　　　　　**Case No.  8:03-cr-298-T-23TBM**

**LENIN V. PEREZ,**

        **Defendant.**

_____/

## REPORT AND RECOMMENDATION

      THIS CAUSE is before the court on referral by the Honorable Steven D. Merryday
for a Report and Recommendation on Defendant Lenin V. Perez's **Motion to Withdraw Plea
of Guilty** (Doc. 212) and the Government's response in opposition (Doc. 214).[1]  An
evidentiary hearing was conducted on the motion on April 19 and 21, 2006.  See (Docs. 234,
236).

I.

      On July 16, 2003, Defendant Lenin Perez (hereinafter "Defendant") was indicted in a
thirty-three count Indictment alleging his participation in a scheme to receive kickbacks for
referrals of individuals for medical care for which payment would be made under a federal
health care program.  See (Doc. 1).  The co-defendant was Joseph Anthony Gonzalez.  Id.

_____

[1]See (Doc. 217); M.D. Fla. R. 6.01(b), 6.01(c).

On the morning of September 19, 2005, both defendants appeared before the district judge for trial.  As developed below, later in the day, both defendants appeared before undersigned to plead guilty.  <u>See</u> (Doc. 189).[2]  In accordance with a written plea agreement (Doc. 190), the Defendant pleaded guilty to Count Three of the Indictment.  After conducting the inquiry required by Rule 11 of the Federal Rules of Criminal Procedure, the undersigned concluded that the Defendant's plea was entered freely and voluntarily with full knowledge of the consequences and submitted a Report and Recommendation (Doc. 195) to the district judge recommending acceptance of the plea.  Defendant filed no objection to this recommendation.  On October 12, 2005, the district judge accepted the plea.  <u>See</u> (Doc. 197).

Defendant appeared for sentencing on January 27, 2006.  Before the proceeding could be completed, the district judge continued the sentencing to permit Defendant to file a motion to withdraw his plea.  <u>See</u> (Doc. 209).  On January 31, 2006, Defendant moved to withdraw his plea of guilty on grounds that he was innocent and his plea was not enter free, voluntary, or knowledgeable.  <u>See</u> (Doc. 212).  On the same date, counsel for the Defendant, Patrick Doherty, Esq., moved to withdraw alleging irreconcilable differences.  <u>See</u> (Doc. 213).  Counsel's motion was granted on January 7, 2006.  <u>See</u> (Doc. 219).  Subsequently, the court appointed new counsel, Frederick Wiley Vollrath, Esq., to represent Defendant.  <u>See</u> (Doc. 221).

--------

[2]Co-defendant Gonzalez also appeared and pleaded guilty to a Superseding Information (Doc. 188) alleging a single count of misprison of felony.  A transcript of the plea hearing appears in the court file as Doc. 207.

II.

At the hearing on the motion to withdraw, the court heard testimony from Cynthia Lakeman, Esq.; Liane Perez-Rodriguez; Vivian L. Perez; the Defendant; and Patrick Doherty, Esq.  A summary of the pertinent testimony follows.

Attorneys Cynthia Lakeman and Tom Fox represent Liane Perez-Rodriguez, Defendant's daughter, in connection with a purported open federal criminal investigation.  On or about December 22, 2003, Ms. Lakeman and Mr. Fox first met with Assistant United States Attorney Jeffrey Downing, to discuss the on-going investigation.  This meeting followed Perez-Rodriguez's appearance to provide fingerprints and handwriting exemplars to agents with the FBI.  Lakeman's impression from the discussions at both appearances was that this was really about the Defendant and if the Defendant cooperated on the then-pending Indictment, the investigation against her client would cease.  In the witness's view, the government investigation of Perez-Rodriguez was intended to put additional pressure on the Defendant.

On January 6, 2004, Ms. Lakeman sent a letter to Mr. Doherty, Defendant's court-appointed counsel, conveying her sense of the conversations with AUSA Downing and the agents.  See Def. Ex. 1.  According to the letter, counsel wished to advise Doherty of her meeting with Downing, and she noted in pertinent part:

> It was made abundantly clear that the only reason Liane is being investigated is to provide additional pressure on her father to get him to enter into a cooperation agreement with the government and resolve the case presently pending against him.  It was also confirmed that the government does not believe that Liane has any information that she could provide that would differ from the information which they

3

> already have relating to the potential mail fraud charges
> against your client, Mr. Perez.  As such, any hope of
> obtaining favorable treatment for Liane is totally dependant
> upon the cooperation of her father.

Id.  The letter further requested Doherty to relay this information to the Defendant and that

counsel discuss the matter further.  In rather vague terms, Lakeman indicated that she spoke

with Doherty on a few occasions thereafter.  She knew from those conversations that the

Defendant was aware of the potential of his daughter being charged if he did not cooperate.

By her account, Doherty related that the Defendant did not care because he knew the

Government had nothing on his daughter and had no basis to prosecute her.

Ms. Perez-Rodriguez testified that in or about November 2003, she first learned that

she and her father were under investigation by the Government when she was subpoenaed for

fingerprints and handwriting exemplars.  As she describes the matter, the Government was

going to use her to get to the Defendant, and her impression was also that the investigation

against her would cease if the Defendant pleaded guilty and cooperated with the Government.

She conveyed this information to her father.

On September 19, 2005, she accompanied the Defendant and her step-mother to the

courthouse to lend support.  She testified that they initially met in a conference room outside

the courtroom with Co-defendant Gonzalez; his attorney, Jose Barreiro; and Doherty.

Sometime after their arrival, Sonja Bonanno also entered the conference room.  Mr. Barreiro

advised them of a plea offer made to Gonzalez.  Doherty, who was in and out of the

conference room, eventually indicated that the Defendant could plead and that no charges

would be brought against Perez-Rodriguez.  By her testimony, the Defendant became upset

when reviewing the written plea agreement because it named people that he claimed not even to know.  When the Defendant complained, Doherty indicated that unless the Defendant signed the plea deal, he would be "kicking his way into prison" and the Government would be coming to get her.  By her account, Doherty repeated this statement several times while they were in the room.  Perez-Rodriguez testified that she protested to Doherty that the agreement did not mention her not being charged, and Doherty insisted it did at paragraph seven and refused to return to the prosecutor to discuss it further.  Eventually, she pleaded with her father to take the deal, and he agreed to do so.

On cross-examination, Ms. Perez-Rodriguez agreed that the agents assigned to take her fingerprints told her they were investigating false documentation from the National Association of Letter Carriers to the Salvation Army and that some of the letters had been signed by her, which explained the need for her fingerprints and handwriting exemplars.  She understood that they were investigating her and her father.  She could not say that the agents actually told her she would not be charged if her father cooperated in his case, but that was her impression.  According to the witness, she does not know if her father ever cooperated by speaking with the agents, but she has never been charged.  Perez-Rodriguez acknowledged to the court that she was present when her father pleaded guilty.

Vivian L. Perez, the wife of the Defendant, testified that the Defendant intended to try his case all along.  On the morning of the first day of trial, they entered the courthouse and met in a conference room.  There were discussions regarding a possible plea, but the Defendant indicated he wished to have a trial.  Mrs. Perez recalled Doherty coming in and out of the conference room and ultimately presenting a plea agreement to the Defendant by which

5

he would plead guilty to a single count.  According to her, Doherty repeatedly indicated that if Defendant did not plead, he would be "kicking his way into prison" and his daughter would be charged as well.  By her testimony, Defendant continued to insist on a trial.  Doherty promised that if Defendant signed the plea agreement, the Government would leave his daughter alone.  Ultimately, Perez-Rodriguez asked him to sign the agreement, and out of concern for his daughter, the Defendant changed his mind and pleaded guilty.  The witness acknowledged that she was also present at the plea hearing.

According to the Defendant, he was charged in this case in or about July 2003. Perez-Rodriguez is his daughter, and she has two children.  During the pendency of his case, he learned that government agents were questioning his daughter about another matter, and he viewed this as a tactic to "squeeze" him on his pending charge.  Nonetheless, he was quite concerned about his daughter's circumstances.

On December 19, 2005, he came to court fully anticipating a trial.  When he entered into the conference room, he learned from Jose Barreiro that the Government was offering Gonzalez a plea to misprison.  By his account, Barreiro suggested that he would be foolish not to take such a plea, that Gonzalez's wife was undergoing chemotherapy, that Gonzalez would not take a deal unless the Defendant did, and that a trial would probably kill Gonzalez's wife.  Doherty was advised of the offer, and he left to speak with the prosecutor. Ultimately, Doherty reported back to him that the Government would not permit him to plead to a misprison charge, and Defendant indicated that he was ready to proceed to trial.

According to the witness, Doherty kept saying over and over, "you are going to kick your way into prison and they are going to arrest your daughter," and Doherty indicated that if

Defendant pleaded guilty to one count, the Government would not go after his daughter. Eventually, Doherty produced a written plea agreement. According to the Defendant, it related to Count Four, and he protested the agreement because it referenced individuals [in the kickback scheme] whom he did not know or recognize. According to the Defendant, Doherty's response was again to indicate that the Defendant was kicking his way into prison and that if he did not plead, his daughter would be arrested. When his daughter complained that the agreement did not reference her not being charged and she asked him to get it changed, Doherty refused. According to the Defendant, he was asked by his daughter to sign the plea agreement, and he did so.

On cross-examination, the Defendant essentially indicated that Doherty's repeated threats of harm to his daughter if he did not plead prompted him to plead guilty. By his account, he lied to the court so that the plea could be accomplished. According to the Defendant, about 90% of what he said to the court was a lie. While he recalled indicating to the court that there had been no promises apart from the plea agreement and no threats or coercion made to induce the plea, he claimed that he only gave such testimony to assure that the plea would go through and his daughter would avoid harm.

On redirect, the Defendant indicated that he regretted entering the plea within ten minutes of concluding the plea colloquy. According to the Defendant, he was unaware he had the option to withdraw the plea until the district judge mentioned the matter at sentencing.

Mr. Doherty was called in rebuttal by the government. He testified that in early 2004, at a meeting with AUSA Downing, he learned that the Government was conducting a second investigation of the Defendant and that the Defendant's daughter was a possible co-

7

defendant.  Based on the information learned from Downing, he concluded that the investigation was not without some substance.  Doherty discussed the information with the Defendant and advised him that the charges were potentially serious involving mail fraud and included allegations against his daughter.  According to Doherty, the Defendant indicated he did not care.  Eventually, Doherty came to conclude that the Defendant's lack of concern over this investigation was based on his misunderstanding of the law and his belief that his daughter could not be charged because she had never actually mailed any items.  Doherty admitted that he told both Ms. Lakeman and AUSA Downing of the Defendant's response that he did not care about the second investigation.  Doherty insists that at no time during the period leading up to his plea did the Defendant ever express any concern regarding potential charges against the daughter.

Prior to trial, the Defendant asked Doherty to explore a possible plea.  Thus, Doherty indicated he received an August 22, 2005, letter written by the Defendant suggesting a meeting with Downing and the possibility of avoiding a trial.  In June 2005, the Defendant had proposed a possible disposition to a misdemeanor.  In discussions regarding a plea, Doherty advised the Defendant of the possibility of prison time.

On the first morning of the scheduled trial, Doherty learned that Barreiro had sought and received a plea offer from the Government involving a misprison of felony charge for Gonzalez.  Doherty approached Downing about the possibility of such a plea arrangement for the Defendant and was told that such a plea was not possible but that the Defendant could plead to a single count of the Indictment.  He relayed this information to the Defendant and produced a written plea agreement.  For a period of about one and a half hours, the Defendant

spoke with his family, his "constant legal advisor" Bob Bonanno, and Doherty, debating whether he should go to trial or take the plea offer.  As he waffled back and forth about pleading, the Defendant at one point said he would plead "for Joe."  Subsequently, he indicated that he would plead "for his wife."  On both occasions, Doherty testified that he insisted to the Defendant that he could not plead either "for Joe" or "for his wife" and had to plead of his own accord.  Doherty insists that at no time prior to the plea did the Defendant ever indicate that he was pleading because of his daughter.  By Doherty's testimony, he did not coerce or threaten the Defendant regarding his daughter.  The fact of the matter was that there was a second case underway, and the Defendant had to know about it, as well as the potential that it could involve his daughter.

On cross-examination, Doherty indicated that at the time of the plea, he believed that if the Defendant pleaded, the Government would not proceed against him on the second investigation and the Government had no intention of proceeding against his daughter alone. Doherty acknowledged that he conveyed to the Defendant on the morning of trial that if he persisted on waffling about a plea, he would be "breaking into prison" and the government could indict his daughter and send her to prison as well.  By Doherty's explanation, the Defendant was prone to suggest defense tactics that likely would have been antagonistic and counterproductive, what Doherty describes as "breaking into prison" conduct.  In this respect, he was seeking to convey his view that if the Defendant did not do anything foolish or antagonistic and accepted the plea offered, Doherty did not believe the government would pursue the second investigation or go after his daughter or him.  Doherty testified that he could not make any explicit promise about the daughter because he did not have any

knowledge to permit it.  Doherty also advised that the matter of the Defendant withdrawing

his plea was first raised when they were well into the sentencing proceeding, after they had

lost certain objections related to the guidelines calculation.


## III.

Because a guilty plea involves the waiver of a number of a defendant's constitutional

rights, it must be made knowingly and voluntarily to satisfy the requirements of due process.

United States v. Moriarty, 429 F.3d 1012, 1019 (11th Cir. 2005) (citing Brady v. United

States, 397 U.S. 742, 748 (1970); Galbraith v. United States, 313 F.3d 1001, 1006 (7th Cir.

2002)).  The Supreme Court has defined a voluntary plea as "a plea of guilty entered by one

fully aware of the direct consequences, including the actual value of any commitments made

to him by the court, prosecutor, or his own counsel, must stand unless induced by threats (or

promises to discontinue improper harassment), misrepresentation (including unfulfilled or

unfulfillable promises), or perhaps by promises that are by their nature improper as having no

proper relationship to the prosecutor's business (e.g., bribes)." United States v. Cothran, 302

F.3d 279, 283 (5th Cir. 2002) (citing Brady v. United States, 397 U.S. 742 (1970)).  A court

accepting a guilty plea must comply with Rule 11 of the Federal Rules of Criminal Procedure

and address specifically three "core principles," ensuring that a defendant (1) enters his guilty

plea free from coercion, (2) understands the nature of the charges, and (3) understands the

consequences of his plea.  Moriarty, 429 F.3d at 1019 (citing United States v. Jones, 143 F.3d

1417, 1418-19 (11th Cir.1998) (per curiam)).  There is a strong presumption that the

statements made during the plea colloquy are true.  United States v. Medlock, 12 F.3d 185, 187 (11th Cir. 1994).

Rule 11 allows a defendant to withdraw a guilty plea after the acceptance of the plea by the district court and prior to the imposition of sentence if "the defendant can show a fair and just reason for requesting the withdrawal." Fed. R. Crim. P. 11(d)(2)(B).  While the provisions of this rule should be "liberally construed" when applied to pre-sentence motions, there is no absolute right to withdraw a guilty plea.  United States v. Ross, No. 04-15105, 2005 WL 2185543, at *1 (11th Cir. Sept. 12, 2005) (citing United States v. McCarty, 99 F.3d 383, 385 (11th Cir. 1996); Medlock, 12 F.3d at 187).  In determining whether a defendant has shown a fair and just reason, the district court evaluates the totality of the circumstances, including "(1) whether close assistance of counsel was available; (2) whether the plea was knowing and voluntary; (3) whether judicial resources would be conserved; and (4) whether the government would be prejudiced if the defendant were allowed to withdraw his plea." United States v. Freixas, 332 F.3d 1314, 1318 (11th Cir. 2003) (quoting United States v. Buckles, 843 F.2d 469, 472 (11th Cir.1988)).  The good faith, credibility, and weight of a defendant's assertions in support of a motion to withdraw a guilty plea are issues for the trial court to decide.  Buckles, 843 F.2d at 472.  Additionally, the court should also consider the timing of the motion to withdraw; "[t]he longer the delay between the entry of the plea and the motion to withdraw it, the more substantial the reasons must be as to why the defendant seeks withdrawal."  Id. at 473; United States v. Rogers, 848 F.2d 166, 168 (11th Cir.1988). The decision whether to allow a defendant to withdraw his guilty plea is left to the sound discretion of the trial court.  Buckles, 843 F.2d at 471.

11

IV.

At the hearing, counsel for the Defendant indicated that his claim for relief was not founded on any inadequacy of the plea colloquy under Rule 11, but instead was based on the coercive effect of the threats of prison and the possible arrest, prosecution, and imprisonment of the Defendant's daughter, such that he did not enter the plea freely and voluntarily.  For the reasons set forth, I conclude that the Defendant entered his guilty plea freely and voluntarily with full knowledge of his right to contest the charges at a trial and a complete understanding of the consequences of waiving such right and pleading guilty.

I find as follows.  The Defendant had the close assistance of experienced counsel throughout the pendency of these proceedings.  Mr. Doherty is an experienced criminal defense attorney well known to this court as an able trial advocate for the accused of this district.  His testimony that he appeared at this court on September 19, 2005, prepared for trial is fully credited by the court.  The Defendant is a street smart, experienced citizen and former head of the postal union local.[3]  He claims presently to be a consultant on federal workers' compensation matters.  For years, he has been aware of and endured investigations by federal agents into his activities.  In hearings before the court, he has demonstrated his clear intention not to be bullied by the Government.  The testimony that he professed to be unconcerned about the Government's threat to prosecute his daughter because they had no case, despite his

---

[3]The undersigned has had more than the usual contact with this defendant during the pretrial period, and as the docket for these proceedings indicates, the undersigned has conducted lengthy *in camera* hearings with the Defendant and Doherty.  See (Docs. S-156, S-160, S-166).  These hearings demonstrated a good deal concerning the Defendant's attitude toward the prosecution, his independence from his counsel, and a willingness to plow ahead with defenses that were not actually available or perhaps even counterproductive despite the advice of counsel.

lawyer's advice that it might, is a good illustration of this tough attitude.  In my view, both counsel and client were ready to proceed to trial when they appeared at court that morning.  Despite the Defendant's complaints, Doherty's close attention to the defense of his client continued through the events of that day.  While both men anticipated a trial, the possibility of plea bargain arose almost immediately upon their arrival.  I agree with counsel that he was duty-bound to pursue a possible settlement.  It is clear that Defendant and Doherty had discussed the possibility of a plea on prior occasions.  Any suggestion that the Defendant was not aware he was facing a prison sentence upon conviction in this matter is ridiculous.

The plea agreement that emerged is a standard form agreement used in this district and called for the Defendant to plead to Count Three in exchange for the eventual dismissal of the remaining thirty-two counts.  (Doc. 190).  The prosecutor also agreed to forgo further charges against the Defendant for any other crimes about which it had knowledge and agreed not to oppose at sentencing the Defendant's request for a two-level downward adjustment for acceptance of responsibility.  By any objective consideration, the plea offer was a generous one in favor of the Defendant, and surely Doherty was cognizant of that fact.

The evidence supports that the Defendant struggled with whether of not to accept the plea offer.  Doherty admits that he reached a point where, in essence, he became fed up with the waffling, and he said they should go to trial.  Doherty did invoke the prospect of the arrest and prosecution of Perez-Rodriguez.  In my view, the comments about "breaking into prison" and the potential arrest of the daughter were the product of Doherty's candid assessment of a difficult client, a favorable plea offer, and the potential harm that could arise from Defendant's refusal to accept it.  Despite his bluster, the Defendant must have factored these

comments by counsel into his decision to plead.  The plea colloquy speaks for itself.  The Defendant, under oath, gave no indication of any undue influence or coercion at work in his plea.  As the record reflects, Doherty continued to represent the Defendant effectively through the aborted sentencing hearing.

To the extent that the Defendant claims that his plea was not knowingly entered, the record and Defendant's own testimony reveal the contrary.  While this plea was negotiated on the morning of the scheduled first day of trial, the court afforded Defendant a considerable period of time to discuss it with his family and his counsel.  The plea colloquy reveals that the court too discussed the charge, the potential punishment, and the particulars of the plea agreement with the Defendant.  Even the Defendant's testimony at the hearing on this motion indicates that he knew exactly what he was doing in entering his plea.  There is no support for his claim that the plea was not knowingly entered.  Defendant's testimony at the plea hearing and the hearing on this motion also indicates that he acted freely in entering his guilty plea in the sense that he acted on his own volition.  Indeed, by his present testimony, he deliberately set out to do whatever it took, including lying to the court, to make the plea happen.  As I see his claim, it centers on whether he was wrongfully compelled to that act by the comments by his attorney.

The only real issue raised by the instant motion is whether his plea was coerced and thus rendered involuntary.  It is my conclusion that Mr. Doherty undoubtedly recognized and sought to convey to the Defendant that the offer from the Government was a good one.  While the plea agreement did not expressly reference the Defendant's daughter, and there is no indication that the government made any contemporaneous reference to the daughter in

14

connection with the plea discussions that morning, her circumstances were a necessary part of the pre-plea discussions between the Defendant, his family, and Doherty.[4]  In the given circumstances, I do not believe that Doherty's admonition about "breaking into prison" and the possible arrest and prosecution of the Defendant's daughter was intended to improperly coerce a plea.  Here, he was obliged to address the matter with his candid assessment.  Even if his comments could be construed as threatening, they were not without a basis in the circumstances nor did they misrepresent any known facts.  I conclude that the comments by counsel reflected nothing more than his professional opinion of the consequences of a refusal to accept a good plea offer and thus were fair comment in these circumstances.

More significantly, I conclude that these comments by counsel, though a factor in his decision, did not compel the Defendant to do something he was unwilling to do.  There were multiple benefits in his accepting this plea offer, only one of which was its likely benefit to his daughter.  In the end, the plea indicates that the Defendant reached this conclusion on his

---

[4]From one perspective, the issue here may actually relate to the adequacy and effectiveness of Doherty's representation and whether he overstepped the bounds of acceptable conduct to force a plea his client was not otherwise willing to make.  This is clearly not a case where it is alleged the Government induced the plea through threats to prosecute a third party and where the court must inquire into the government's good faith.  See, e.g., United States v. Martin, 760 F.2d 1244 (11th Cir. 1985); United States v. Costello, 724 F.2d 813 (9th Cir. 1984); United States v. Mcelhaney, No. CRIMA303CR370L1, 2005 WL 3148234 (N.D. Tex. Nov. 17, 2005).  However, the record is clear that beginning at least in November or December 2003, Ms. Perez-Rodriguez and her counsel were aware of a separate investigation involving her, and Doherty and the Defendant learned of this at least by early 2004.  As far as they knew, the investigation was still open.  As Doherty testified, he had to address the matter if he was to offer effective assistance of counsel.

own.  Thus, I cannot conclude that the Defendant was coerced into a plea he was not otherwise inclined to enter.  Nothing about the plea colloquy detracts from that conclusion.[5]

The fact that the Defendant waited until his sentencing proceeding over four months later does little to help his cause and suggests his ill-conceived scheming.[6]  His professed ignorance of the right to withdraw his plea at an earlier time is wholly unbelievable given the assistance of Mr. Doherty as well as his confidante, Mr. Bonanno, who is also an attorney.  If anything, the sequence of events underscores Mr. Doherty's testimony of the Defendant's penchant for ill-timed and ill-advised tactics counterproductive to his best interests.

While the law professes to favor a trial on the merits, the resources of the court are undoubtedly conserved when a multi-week jury trial on a thirty-three count indictment can be resolved by the entry and acceptance of a guilty plea.  Considerable cost in time and money are saved in every such case and especially so here, where new counsel would need to begin anew to prepare this case for trial and the court would again have to carve out a large block of time to try the case.  This case also involved dozens of witnesses and a considerable effort by the court and the U.S. Marshal to assure these witnesses were available for trial.  The same effort would have to be repeated for another trial.

By its response, the Government maintains that it would be highly prejudiced were the Defendant permitted to withdraw his plea given the effort necessary to again prepare for

---

[5]Nor does the plea colloquy reveal that the Defendant was unsatisfied with the assistance provided by Doherty.

[6]The government asserts that the Defendant gave no lawful cause why sentencing could not proceed and only protested when it became apparent that the sentencing guideline calculation would be greater than hoped for.  Only then did he protest his innocence and suggest any problems with his plea.

such a trial and the potential unavailability of its witnesses.  I give little weight to this

argument, as frankly it appears it was the Government that "blinked" in this instance,

resulting in a last minute settlement that likely could have been reached through earlier

discussions with defense counsel.


V.

In conclusion, while I fully recognize the value of a trial on the merits and

understand the court should liberally construe the provisions of Rule 11(d)(2)(B) of the

Federal Rules of Criminal Procedure when applied to pre-sentence motions, I conclude that

the Defendant has not presented a fair and just reason to merit the granting of this motion.

The Defendant knew of and understood fully the nature of the charges in Count Three, as well

as the consequences of a guilty plea to that charge when he pleaded guilty on September 19,

2005.  While Defendant had a difficult choice to make in accepting the plea, he did so on his

own accord and without inappropriate inducement or coercion.  Accordingly, I recommend

that the court deny Defendant's Motion to Withdraw Plea of Guilty (Doc. 212) and proceed to

sentencing.


Respectfully submitted this
28th day of April 2006.


THOMAS B. McCOUN III
UNITED STATES MAGISTRATE JUDGE


17

**NOTICE TO PARTIES**

Failure to file written objections to the proposed findings and recommendations contained in this report within ten days from the date of its service may constitute a waiver of the issues raised herein and shall bar an aggrieved party from attacking the factual findings on appeal and a *de novo* determination by a district judge.  28 U.S.C. § 636(b)(1); M.D. Fla. R. 6.02.

Copies furnished to:
The Honorable Steven D. Merryday, United States District Judge
Jeff Downing, Assistant United States Attorney
Fred Vollrath, Attorney for Defendant